## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GWI ENTERPRISE LTD., Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiff,<br><br>v.<br><br>JBS S.A., WESLEY MENDONÇA BATISTA, GILBERTO TOMAZONI, and JOESLEY MENDONÇA BATISTA,<br><br>                                    Defendants. | Case No. 17-cv-4019<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff GWI Enterprise Ltd. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's Complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by JBS S.A. ("JBS" or the "Company"), as well as media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action lawsuit on behalf of a class consisting of all persons and entities, other than Defendants and their affiliates, who purchased or otherwise acquired the publicly traded American Depositary Receipts ("ADRs") of JBS from June 2, 2015 through May 19, 2017, both dates inclusive ("Class Period"), seeking to recover compensable damages caused

by Defendants' violations of federal securities laws and pursue remedies under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      The Company made materially false and/or misleading statements, misrepresenting its business operations and legal compliance.

3.      As a result of the fraudulent conduct alleged herein, Plaintiff and other members of the Class purchased JBS securities at artificially inflated prices and suffered significant losses and damages once the truth emerged.

## JURISDICTION AND VENUE

4.      The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Securities Act (15 U.S.C. §78aa.). This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

6.      Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of material false and/or misleading information, occurred in this District.

## PARTIES

7.     Plaintiff purchased JBS securities within the Class Period and, as a result, was damaged thereby. Plaintiff's certification evidencing its transactions is attached hereto as Exhibit A.

8.     Defendant JBS, a food company, engages in the processing and trading of animal protein in Brazil and internationally. The company was formerly known as Friboi Ltda. JBS S.A. was founded in 1953 and is headquartered in Sao Paulo, Brazil. The Company's Level 1 Sponsored ADRs trade on the OTCQX market (the "OTC Market") under the symbol "JBSAY."

9.     Defendant Wesley Mendonça Batista ("W. Batista") has been the Chief Executive Officer ("CEO") of JBS since February 1, 2011 and serves as its Member of the Executive Board.

10.     Defendant Gilberto Tomazoni ("Tomazoni") has been the Global President of JBS Operations Management Team at JBS Since 2015.

11.     Defendant Joesley Mendonça Batista ("J. Batista") has been the Chairman of JBS throughout the Class Period.

12.     Defendants in paragraphs 9-11 are collectively referred to herein as the "Individual Defendants."

13.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(d)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(e)     was aware of or deliberately recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(f)     approved or ratified these statements in violation of the federal securities laws.

14.     Because of the Individual Defendants' positions within the Company, they had access to undisclosed information about JBS's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

15.     As officers of a publicly-held company whose ADRs were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded ADRs would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

16.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of JBS's reports to the SEC, press releases, and presentations to analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

17.     Each of the Individual Defendants are liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of JBS ADRs by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding JBS's business, operations, management and the intrinsic value of its ADRs and (ii) caused Plaintiff and other shareholders to purchase JBS ADRs at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### A.    Company Background

18.     JBS, a company with over 60 years' experience, is a global food industry leader with over 230 thousand employees worldwide.

19.     JBS operates production platforms and commercial offices in over 20 countries and has a diverse product portfolio that includes dozens of instantly recognizable global brands. The Company is also active in other sectors related to its core business, such as leather, biodiesel, collagen, soaps, glycerin and natural casings and owns waste management, metal packaging and shipping businesses that support its global operations.

20.     The Company's diverse portfolio includes brands such as Seara, Swift, Friboi, Doriana, Moy Park, Cabana LasLilas, Pilgrim's, Primo, Gold KistFarms, Pierce and 1855, among others. This range of products and its global footprint means JBS is able to serve over 300 thousand customers in more than 150 countries.

**B.     Material Misstatements and Omissions during the Class Period**

21.     On June 2, 2015, JBS issued its Annual Report for the fiscal year ended December 31, 2014 entitled "Annual and Sustainability Report 2014," (the "2014 Annual Report"). The 2014 Annual Report contained a letter from Defendant W. Batista, stating in relevant part:

> JBS had great victories and achievements in 2014. We continued to harvest from the transformational movements that we performed in the last few years in order to transform our Company into a multinational of Brazilian origin. We feel certain that the timing of the relevant investments made by us could not have been better or more opportunistic. Today, these investments bring excellent results to our Company. We are confident that we built a unique global production platform, efficient and well positioned in countries that provide the most competitive environment to produce food products.
>
> **We reached more than R$120 billion in consolidated net sales in 2014, an increase of 30% compared with 2013**. This made us the largest Brazilian private company in terms of revenues. In 2014, we were also ranked as the second largest food company in the whole world. Our EBITDA was R$11.1 billion, which represents an increase of 81% over the previous year, with an EBITDA margin of 9.2%. Our net income came in at R$2.0 billion, also presenting an impressive improvement of 120% over 2013. In addition, we evolved in our cash generation from operations, which reached R$9.0 billion, and in free cash generation, after investments, of R$4.7 billion.

**In the United States we have a well adjusted operation where we had an expressive result during last year. Pilgrim's Pride, our chicken business in the US, performed really well in 2014, as a result of a management committed to reduced production costs, high levels of productivity and rationalization of its sales mix.** Net revenue for this business was US$8.6 billion, with an EBITDA of US$1.35 billion, representing a margin of 15.7%. **In Mexico, where we already have operations, we announced the acquisition of the Tyson's assets there, which is still pending approval from local authorities. This transaction, when approved, will practically double our production capacity in that country**.

**We reorganized our beef operation in the US, splitting the management of fed cattle from the regional business which is more focused on the processing of cows and Holsteins. This strategy allowed us to have more agility and focus on the decision making process and flexibility to adapt to ever changing market conditions**. Net revenues from this business unit, including operations in Canada and Australia, surpassed US$21.6 billion, with EBITDA of US$916.1 million, which represents a margin of 4.2%. In our pork unit, we posted US$3.8 billion in revenues, with an EBITDA margin of 10.6%, the best result in the pork industry in the US.

**We increased our Sales to Asia, a growing market in terms of consumption of meats, through our Australian operation, which presented an excellent performance during last year**. Australia is a strategic region for food production in a global context and we decided to expand our operation there through the acquisition of the Primo Smallgoods Group, a leading company in the prepared and convenience meat category.

**We achieved satisfactory results at the JBS Foods unit, one year after its creation. During this period, we implemented the necessary operational adjustments. We captured synergies, reformulated products, launched new products and initiated a broad marketing campaign, focusing on the Seara brand, with an emphasis on healthy products of superior quality, offering convenience and practicality to consumers.** In the year, sales from JBS Foods reached R$12.9 billion and EBITDA surpassed R$2.05 billion, with a margin of 15.9%.

(Emphasis added).

22.     The 2014 Annual Report touted the quality of JBS' products, stating in relevant part:

7

### Quality Control

The Company has full control over its processes with the help of cutting-edge technology and structured programs. **The care that JBS puts into its products is reflected in its nationally and internationally recognized quality.**

\* \* \*

**JBS has a market leading portfolio of brands recognized by the public as being synonymous with quality and reliability.** In addition to the strong reputation of quality and transparency in the sourcing of products – both important for customer confidence and loyalty – the company's recent marketing efforts have incentivized a change in consumption habits among Brazilian consumers.

\* \* \*

In the poultry and pork operations, the origin and quality of the raw material are guaranteed through JBS' integrated relationship with the breeders. The Agriculture team conducts regular visits and audits supplier processes to ensure that the production practices are in line with the criteria required by JBS. With regard to product quality, JBS has a dedicated area – the Quality Assurance Department – to monitor the entire production process, which is constantly audited by different regulatory agencies and customers in order to maintain the credentials needed to serve all markets.

\* \* \*

### Responsibility for the Quality of the Products
GRI G4 FP12

To ensure the quality, health and sustainability of its entire line of products, JBS has rigorous processes that permeate its entire chain of production. There are more than 30 programs for beef production, the most important of which are described in this chapter, which meet the requirements of the Ministry of Agriculture, Livestock and Supply (MAPA) and which, taken together, are responsible for the production of reliable, safe, healthy and quality foods. In addition, all of the JBS processing units are part of the National Waste Control Plan for Products of Animal Origin (PNCRC), an initiative by the Federal Inspection System (SIF) that collects samples of raw materials used in the industrial processes for human food in order to evaluate food safety items, such as contaminants.

### Certifications
GRI G4- FP5

In the Brazilian cattle operations, JBS has certifications that attest to compliance with international norms (ISO 9001, ISO 14001, BRC, SQMS, among others) at its plants. These certifications involve food safety, animal welfare, the quality management model, the environmental management model, and generally ensure and certify the food safety and quality of JBS's processes and products. The certified units in 2014

represent, in terms of production volume, 51% of JBS's total production volume in Brazil.

(Emphasis added).

23.    The 2014 Annual Report touted JBS' adherence to the best practices in corporate governance, stating in relevant part:

**_Transparency & Communication with Stakeholders_**

**JBS adheres to the best practices in corporate governance – including transparency and equity in the disclosure of information** – which qualifies the Company to the Novo Mercado segment of the BM&FBovespa.

(Emphasis added).

24.    The 2014 Annual Report also touted the experienced managers and executives at JBS and their alignment with JBS' values, stating in relevant part:

**_Experienced and Industry-Specialized Management_**

JBS has a team of experienced managers with expertise in the market, **focused on growing sales, optimizing resources and increasing operational efficiency**. JBS is highly professionalized and each business unit has its own management. Of the strategy for selecting competent executives takes into consideration experience in the sector **and alignment with the company's values**, such as an ownership attitude and a focus on results.

(Emphasis added).

25.    The 2014 Annual Report stated that JBS maintains relationships with different governments and makes donations to political parties, stating in relevant part:

**_Government_**
GRI G4 SO6
JBS maintains, through local entities and agencies, relationship with the different governments in the countries in which it operates.
         * * *
In order to contribute to the political debate and the development of democracy, JBS makes donations to political parties provided that the projects presented by the organizations are in line with the Company's

values and beliefs. All of the information regarding the donations made by JBS is available on the website of the Superior Electoral Court.

26.     The 2014 Annual Report touted the policies concerning the issues that are relevant to the Company's best practices, stating in relevant part:

> *Policies*
> To ensure ethical conduct and integrity in the management of its business, JBS has clear policies regarding the issues relevant to the company's best practices.
> They are:
>
> *Disclosure Policy for Material Information*
> Based on the principles of transparency and fairness in dealing with investors and the capital markets, this policy establishes the use and disclosure of information classified as material facts, as well as rules and guidelines about the use, publication and maintenance of the confidentiality of information that has not been released to the public yet.
>                              * * *
> *Integrated Management System Policy (Environment, Quality, and Occupational Health and Safety)*
> JBS Beef Division in Brazil instituted a policy that consolidates into a single document JBS' commitments in relation to Quality, the Environment and Occupational Health and Safety, which aims to upgrade and continuously improve its processes.
>                              * * *
> *Ethical Conduct*
> GRI G4-56
> In order to guide the conduct of its team members and suppliers in the business environment, JBS prepared a Manual of Ethical Conduct that addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices and other sensitive topics.
>
> In 2014, JBS' legal department began the process to reformulate the document to adhere to Brazilian Law 12,846/13 regarding anti-corruption and the acts that regulate it. The new version of the Ethics Manual is scheduled for release in 2015.

27.     On June 10, 2016, JBS issued its Annual Report for the fiscal year ended December 31, 2015 entitled "Annual and Sustainability Report 2015," (the "2015 Annual Report"). The 2015 Annual Report contained a letter from Defendant W. Batista, stating in relevant part:

**Analyzing the economic scenario, we recognize global population growth as a key factor that will substantially increase the demand for food and our products**. Moreover, the change in consumption habits, combined with better income distribution in several countries has generated a pursuit for healthier diets, **with higher consumption of more nutritious food and protein-based products**.

We are confident in our global food production platform and in our highly qualified team to lead JBS in our strategy. **We will remain focused on operational excellence and food safety, while we base our business in the highest quality standards and service level to meet and exceed our customer's and consumer's requirements.**

(Emphasis added).

28.    The 2015 Annual Report contained a letter from Defendant Tomazoni, stating in relevant part:

**Business excellence begins by working with the best people. Having the right people in the right place is what really matters and makes a difference. Building strong teams with a clear sense of purpose, aligned with the values that permeate our Company – ownership, determination, simplicity, humility, discipline, sincerity and availability – is one of the most important factors of our management and our culture**.

**We have focused our efforts on Operational Excellence**. The diversity of our operations – in terms of geography, businesses and the portfolio of brands and products – helps us to proceed in this direction, as it allows for an ongoing exchange of experiences between platforms, comparing processes and identifying best practices and operational gaps, enabling important synergy gains.

**At JBS, the quest for quality is more than a strategy. It is part of the Company's culture. We believe that the success of our business is directly related to our ability to produce and deliver the highest quality products, managing the business in a sustainable manner and providing clients and consumers with superior products and services**.

Earning recognition for the quality of our products is a journey, and we have made significant progress. Again, people are critical in this context. **We believe that the quality of what we produce and the excellence of our services is a daily responsibility for all of those who work with us.** The determination and persistence of each JBS employee, in every area of business or place in the world, strengthen

our values and beliefs daily.

(Emphasis added).

29.    The 2015 Annual Report touted the quality of JBS' products and operations, stating

in relevant part:

> In order to achieve JBS's goal of strengthening ties with clients and consumers through a portfolio of brands and value-added products, **the Company's operations are focused on quality**. And quality, for JBS, goes beyond the product.
> **Quality involves operating in accordance with the highest social, economic and environmental standards, having the best team of employees, with the right people in the right positions, cutting-edge factories and partnerships with its stakeholders. JBS's main purpose is to provide quality to its clients and consumers.**

(Emphasis added).

30.    The 2015 Annual Report touted the ethics and integrity of JBS, stating in relevant

part:

> ***Ethics and Integrity***
> GRI G4-56, G4-DMA
> **Trust is what guides JBS in all of its relations with stakeholders. It therefore pervades the Company's daily activities**.
>
> In line with this value and with the aim of reinforcing conduct guidelines, improving and standardizing certain procedures and implementing risk prevention initiatives where needed, in 2015 the Company created the Corporate Compliance Office. Reporting directly to the Institutional Relations Department, **the new structure serves all JBS Group businesses and is responsible for identifying, assessing and monitoring risks, as well as developing training and communication programs for all employees and suppliers**.
>
> **One of the new area's first initiatives was the reissue of JBS's Code of Ethics. The document, which is intended both for the Company's employees and suppliers, established twelve guidelines governing expected conduct in regard to issues related to security, sustainability, anti-corruption practices, money laundering and conflicts of interest. The document, together with its English and Spanish versions, is already available on the Company's intranet**.

(Emphasis added).

31.    The 2015 Annual Report touted the quality of JBS' products, stating in relevant part:

> JBS Foods has based its activities on the development of higher value-added products, focusing on quality and working closely with customers and suppliers.
>
> * * *
>
> Adopts strict quality standards in order to meet the international standards required by customers in Europe, Asia, the Middle East, Oceania, Africa and the Americas, which are its export markets.  These same requirements are in place for the production destined for consumers in Brazil.
>
> * * *
>
> Adopts strict quality standards in order to meet the international standards required by customers in Europe, Asia, the Middle East, Oceania, Africa and the Americas, which are its export markets. These same requirements are in place for the production destined for consumers in Brazil.
>
> * * *
>
> ***Product Integrity***
> GRI G4-DMA
> JBS works to ensure the quality and integrity of its products. To ensure quality product reaches the tables of consumers, **there is an extensive effort made with regard to food quality and safety**, value chain management (including the responsible purchase of raw materials), supplier partnerships and team member training. **Care is also taken to ensure that operations are in line with regulatory requirements and applicable certifications**.
>
> **All products, in all business areas, receive appropriate packaging, and are transported and distributed in accordance with the best practices adopted by the industry**. One of the highlights in Brazil was the inauguration of the JBS Foods Distribution Center (DC), in Fortaleza (Ceará), the final piece in the renovation of the Company's distribution network. There are now 15 DCs serving as a support base for the commercial area, all standardized according to the definitions of the Pillars of Excellence, which are essential to ensuring the best customer service.
>
> **Throughout 2015, all of the JBS units carried out numerous actions focused on the Company's value chain, based on corporate guidelines that consolidated the culture of quality.**
>
> The Company meets the different labeling requirements in 100% of its products, as determined by the laws of the markets where it operates. The

labels have information regarding composition, the nutritional table, name, net weight, storage conditions, manufacturing date, expiration date and manufacturing unit.

In total, 100% of the Company's product labels in Brazil have the Federal Inspection Service (SIF) seal of the Ministry of Agriculture, Livestock and Food Supply (MAPA). In the United States, all products bear the inspection seal of the United States Department of Agriculture, Food Safety and Inspection Service (USDA, FSIS). Some products also present information regarding preparation and consumption, as well as offering different recipes for the preparation of the product and its accompaniments. GRI G4-PR3

Furthermore, the Company lists the ingredients and additives used, specifies those that may contain allergens and specifies any fortification of vitamins, minerals, fiber, etc. GRI FP7

**The Company does not sell products prohibited in the markets in which it operates and adheres to their respective standards and best practices.** GRI G4-PR6

\* \* \*

JBS is committed to supplying its clients and consumers, in all markets in which it operates, with the highest quality products. All of the purchases made in 2015 are in accordance with the procurement policies adopted by the respective JBS business areas.

\* \* \*

*Food Quality and Safety*
GRI G4-DMA
**Quality is an obsession for JBS. It is a fundamental value that permeates the Company's culture and is present in all of its production processes.**

*JBS Beef (Brazil)*
GRI G4-DMA
This business unit includes a structure with 13 in-house laboratories, developing the necessary microbiological analyses to provide food security indicators, ensuring their quality. In 2015, the Company initiated investments to upgrade and standardize the laboratories in terms of layout, equipment and software. With the changes, the laboratories now have structure to issue results in 24 hours, halving the time previously spent.

With this, the Company gained agility in obtaining results and greater efficiency in decision making. Three new laboratories are scheduled to be built in 2016. This structure will cover nearly 100% of the national territory.

\* \* \*

*JBS Foods (Brazil)*

14

At JBS Foods, the quality and health of the poultry and pork is the result of the integrated management of the supply chain. There is a strict management system that covers all production stages, from the selection of the genetics of animals, through processing, to the transportation of goods to the final point of sale. The Company works in partnership with integrated producers, which guarantees the origin of the raw material of the poultry and pork that it sends to market. Thus, the Company has more control over the health and nutritional conditions of the animals, ensuring the quality, safety and cost efficiency of products. All of the businesses of JBS Foods undergo reviews on criteria such as the health and safety of the products and services. GRI G4-DMA, GRI G4-PR1

The JBS Foods Quality System includes the best and most current concepts defined by national and international organizations. To help disseminate these concepts, the Company adheres to guidelines established in its "Quality Book," a set of 15 management tools aimed at planning, execution, control and improvement, as well as defining the responsibilities and authorities of each link in the production chain. Based on this material, JBS Foods held training cycles in the months of July and August 2015, training 150 team members who will become ambassadors of this expertise.

\* \* \*

The Company also has laboratories with facilities for the analysis of food, and all the results of these analyses are entered into the Laboratory Information Management System (LIMS). Through this system, a database is generated with information from across the enterprise on performance and the compliance with established standards, which is updated periodically. With this, it is possible to determine the results for each unit - in relation to products, processes, microbiological and physicochemical analyses - as well as the monthly evolution of the results. This practice is in line with the commitment of JBS Foods to validate its processes to provide a high level of product quality and safety through all that laboratories can measure.

\* \* \*

*Certifications*
GRI FP2, GRI FP5
The various units of JBS Beef (Brazil) underwent 178 audits in 2015 in order to maintain and gain certifications to allow products to be exported to various markets. The plants obtained 97% approval and have been audited according to international standards such as BRC Global Standards, ISO9001, ISO17025, and audits by the Ministry of Agriculture of Brazil, clients and markets (health missions from other countries). GRI G4-DMA, GRI G4-PR1, GRI FP5

In Brazil, all slaughterhouses must submit to some form of sanitary inspection, whether at the municipal, state or federal level. In the case of

JBS, all of the Company's units are under the Federal Inspection Service (SIF) of the Brazilian Ministry of Agriculture, enabling the Company to export from any of its units and market products with the highest level of food safety on the domestic market.

(Emphasis added).

32.     The 2015 Annual Report touted JBS' commitment to adhering to the highest standards of integrity, ethics, and transparency when interacting with government officials and public officials, stating in relevant part:

> ***Governments***
> GRI G4-SO6
> **JBS is committed to adhering to the highest standards of integrity, ethics and transparency when interacting with government officials and public officials**. To guide the conduct of team members and outsourced consultants who interact with the government in the performance of their duties, the Policy on Relations with Government Entities and Public Officials was published in Brazil in 2015. The document, which is applicable to operations in the country, establishes criteria and rules of conduct in the relations of JBS companies with government and/or public officials for meetings, the delivery and receipt of documents and other contact necessary to obtain licenses and permits, present claims, participate in bids and discuss matters relating to the JBS operations that depend on government action.
>
> In all jurisdictions in which JBS operates worldwide, ethics and anti-corruption training is offered in order to ensure compliance with local laws.

(Emphasis added).

33.     The statements in paragraphs 21-32 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) JBS executives bribed regulators and politicians to subvert food inspections of its plants and overlook unsanitary practices, such as processing rotten meat and

running plants with traces of salmonella; (2) Defendant J. Batista was providing monthly bribery payments to a former Brazilian government official and lobbyist; (3) there were irregularities with the loans JBS received from Brazilian state-owned development bank BNDES; (4) the Company and other entities controlled by Defendants W. Batista and J. Batista made suspicious trades that exhibit signs of possible insider trading prior to the revelation of a plea deal by the Company's top executives; and (5) as a result, Defendants' statements about the Company's business, operations and prospects were materially false and misleading and/or lacked a reasonable bases at all relevant times.

**C.**    **The Truth Emerges**

34.    On March 17, 2017, *Reuters* published a report entitled "Brazil police accuse BRF, JBS of subverting food inspections," stating in relevant part:

> **Brazil police accuse BRF, JBS of subverting food inspections**
> March 17, 2017, 11:13:00 AM EDT By Reuters
>
> (Recasts with companies involved, comments from JBS, police investigator, share reaction)
>
> CURITIBA, Brazil, March 17 (Reuters) - Brazilian federal police raided dozens of meatpacker offices on Friday, including industry giants **JBS SA** and BRF SA, **following a two-year investigation into alleged bribery of regulators to subvert inspections of their plants**.
>
> The probe, known as "Operation Weak Flesh," had uncovered about 40 cases of meatpackers who had **bribed inspectors and politicians to overlook unsanitary practices such as processing rotten meat and running plants with traces of salmonella**, police said.
>
> Police investigator Mauricio Moscardi Grillo said there was evidence of some companies manipulating certificates of meat for export to Spain and Italy, raising the risk of foreign restrictions on Brazil's powerhouse protein industry.
>
> **Police said they arrested** three BRF employees and **two JBS** employees, as well **as 20 public officials**.

Shares of JBS, the world's biggest meat producer, and BRF, the largest poultry exporter, fell more than 7 percent each in Sao Paulo trading.

**JBS said in a securities filing that three of its plants and one of its employees were targeted in the probe**, but its executives and headquarters were not targeted. The company said it followed rigorous quality standards and sanitary regulations.

BRF did not have an immediate comment on the investigation.

Brazil's agriculture ministry declined to comment immediately, calling a press conference for 4 p.m. local time (1900 GMT).

In a statement, police said more than 1,100 officers were deployed for 194 raids, and as many as 38 detention orders across six Brazilian states, in the largest-ever search and seizure operation by the federal police.

The food industry investigation is the latest of several sweeping probes into corruption in Brazil as a tougher judiciary takes on cozy relations between the government and powerful businesses amid public outrage during a deep economic depression.

Police said regulators in the food-producing states of Paraná, Minas Gerais and Goiás helped producers place adulterated products in the marketplace. Food processors would also bribe state food safety auditors to issue fake sanitary permits and forgo normal oversight work.

(Reporting by Sergio Spagnuolo; Additional reporting by Pedro Fonseca in Rio de Janeiro, Guillermo Parra-Bernal and Brad Brooks in Sao Paulo; Writing and additional reporting by Brad Haynes; Editing by Daniel Flynn and Bernadette Baum)
(Emphasis added).

35.    On this news, shares of JBS fell $0.71 per share or over 9.2% from its previous closing price to close at $6.96 per share on March 17, 2017, damaging investors.

36.    On March 17, 2017, during aftermarket hours, *The Wall Street Journal* published an article entitled "Brazil Police Launch Massive Anticorruption Probe of Meatpacking Industry," stating in relevant part:

**Brazil Police Launch Massive Anticorruption Probe of Meatpacking Industry**

18

Police allege officials of companies including JBS SA and BRF SA bribed sanitary inspectors

By **ROGERIO JELMAYER** and **LUCIANA MAGALHAES**
Updated March 17, 2017 6:06p.m. ET

SÃO PAULO—Brazilian authorities are investigating some of the world's biggest meatpacking companies for allegedly bribing food-sanitation inspectors to approve sales to domestic and foreign buyers of meats that might otherwise have failed to pass muster.

Among the dozens of **firms targeted are JBS SA** and BRF SA, which both have substantial operations outside Brazil. JBS, the world's leading meatpacking company, owns Swift Foods and a majority share of Pilgrim's, both familiar U.S. brands. BRF is one of the world's biggest chicken exporters.

**"[The firms under investigation] didn't care about the quality of the meat or food" they sold, said a Federal Police official, Mauricio Moscardi Grillo. "They didn't care at all about what they were selling to consumers."**

Shares of JBS plunged 10.6% on Friday, and shares of BRF were down 7.6%. Brazil's benchmark Ibovespa stocks index was down 2.4% on the day.

The investigation could threaten a planned initial public offer by JBS for its international operations, and could cause problems for a possible sale by BRF of a stake in one of its units as well, said Shin Lai, an investment strategist at São Paulo-based research firm Upside Investor. JBS announced in December a reorganization plan that includes an IPO in the U.S. of shares in its international businesses.

**An inspector-veterinarian employed by JBS at one of its plants was allegedly involved in the scheme, documents provided by judicial authorities show. Police said an executive linked to JBS was also under investigation.**
JBS, with units on five continents, said it and its units "rigidly follow" all regulations regarding health inspection of its products and supports all efforts aimed at punishing violations.

BRF said that it meets all regulations and that its products pose no risk to consumers in Brazil or abroad. The company added it was cooperating with authorities on the probe.

An Agriculture Ministry official said the ministry was still investigating how much of the affected meat and meat derivatives were exported, noting most of it was probably sold in the Brazilian market.

**The official, Eumar Novacki, said participants in the scheme falsified sanitation certifications for beef and chicken as well as for hot dogs, bologna, animal feed and pet food.**

"The crime against the Brazilian people is grave," said Mr. Novacki, adding the Brazilian government was also concerned about the impact on the country's image abroad.

"We're big players in the world market, and consumers can seek products from our competitors," he said. "We're worried and we're taking steps" to maintain confidence in Brazilian products.

* * *

Friday's operation was one of the biggest on record in Brazil, authorities said. Police said 1,100 officers acting in six Brazilian states and the Federal District were part of the operation, executing 38 arrest warrants and court orders to collect evidence and seize assets.

The police spokesman, Mr. Grillo, said Friday that some of the bribes went to political parties, but that police still don't know exactly how much. He didn't provide any names of politicians or parties.

(Emphasis added).

37.     On March 17, 2017, during aftermarket hours, *Reuters* published an article entitled

"Brazil police raid BRF and JBS meat plants in bribery probe," stating in relevant part:

WORLD NEWS | Fri Mar 17, 2017 | 7:47pm EDT

**Brazil police raid BRF and JBS meat plants in bribery probe**

By Brad Haynes and Sergio Spagnuolo | SAO PAULO/CURITIBA, BRAZIL

**Brazilian police raided the premises of global meatpacking companies JBS SA** and BRF SA on Friday, as well as dozens of smaller rivals, in a crackdown on alleged bribery of health officials that could threaten $12 billion in annual exports.

**The probe, known as "Operation Weak Flesh," found evidence of**

**meatpackers bribing inspectors and politicians to overlook unsanitary practices such as processing rotten meat and shipping exports with traces of salmonella**, police said.

**Police investigator Mauricio Moscardi Grillo said there was evidence of some companies manipulating certificates for meat exports to European markets, raising the risk of foreign restrictions on Brazil's powerhouse protein industry.**

**"We've never seen a scandal like this in the sector ... It's horrifying,"** said Alex Silva, a livestock analyst with Scot Consultoria. **"This stains the entire system that Brazil has spent years building."**

Brazil exported $6.9 billion of poultry and $5.5 billion of beef last year, according to industry groups, as producers ramped up shipments to China and started sending fresh beef to the United States.

Shares of JBS and BRF plunged 11.0 percent and 7.0 percent, respectively, in Sao Paulo. JBS, the world's biggest meat producer, booked net revenue of 170 billion reais ($55 billion) last year from sales in 150 countries. BRF, the largest poultry exporter, booked net revenue of 39 billion reais in 2016.

**Police said they arrested** three BRF employees **and two from JBS in Friday's raids, as well as 20 public officials.**

**JBS said in a securities filing that three of its plants and one of its employees were targeted in the probe**, but its senior executives and headquarters were not targeted. The company said it followed rigorous quality standards and sanitary regulations.

BRF also said it followed industry regulations and was cooperating with authorities in the investigation.

Court documents cited recordings of BRF director Andre Luiz Baldissera allegedly discussing on March 13 how health officials could help defend the company after inspectors in Italy found traces of salmonella in four containers shipped from a plant in Goiás state in central Brazil.

The ruling by federal judge Marcos Silva also included transcripts of BRF government relations executive Roney Nogueira allegedly discussing bribery of health inspectors, including one called on to help avoid the closure of the same Goiás plant.

The judge also ordered that BRF Vice President José Roberto Pernomian Rodrigues be brought in for questioning. Baldissera, Nogueira and Rodrigues could not be reached for comment.

**PLANTS CLOSED**

Brazil's Agriculture Ministry temporarily closed three plants cited in the investigation, one run by BRF and two run by smaller rival Grupo Peccin, and began removing their meat products from supermarkets.

Eumar Novacki, the ministry's executive secretary, said there was some concern that other countries would begin blocking shipments of Brazilian meat. Agriculture Minister Blairo Maggi will meet on Monday with foreign ambassadors to allay concerns.

Sergio De Zen, a livestock expert at the University of Sao Paulo, said other countries may be eager to block Brazilian exports in the fiercely competitive protein market.

"But the impact will not be as big as it would be if another country had discovered this problem," he said. "It is Brazil itself that is revealing this."

United States food safety body FSIS said it was in contact with Brazil's government and monitoring the situation. It said food supply in the U.S. was safe due to a re-inspection system applied to all imported meats.

The food industry investigation is the latest in a string of corruption probes in Brazil, as a tougher judiciary takes on cozy relations between the government and powerful businesses, backed by public outrage during a deep economic slump.

After investigations into political kickbacks on public works and oil and gas contracts, Friday's probe struck at the heart of the booming agricultural sector, one of the few bright spots in Brazil's economy and a major source of exports.

**Police said there was evidence that meatpackers falsified documentation for exports to Europe, China and the Middle East.**

**Judge Silva wrote in his ruling that employees of some meatpackers, including BRF, arranged bribes and favors for inspectors ranging from political donations and favorable bank loans to small bribes including hams and other meat products**.
**In some cases, those inspectors would then allow employees of the meatpackers to enter government offices, access computers and issue their own export certificates, investigators said.**

(Reporting by Brad Haynes; Additional reporting by Sergio Spagnuolo in Curitiba, Pedro Fonseca in Rio de Janeiro, Guillermo Parra-Bernal, Brad

Brooks, Marcelo Teixeira and Alberto Alerigi in Sao Paulo, Mark Weinraub in Washington; Editing by Daniel Flynn, Marguerita Choy and Bernard Orr)

(Emphasis added).

38.     On March 18, 2017, the *Associated Press* published an article entitled "Brazlilian firms 'bribed inspectors to keep rotten meat on market' as plants raided in corruption probe," stating in relevant part:

### Brazilian firms 'bribed inspectors to keep rotten meat on market' as plants raided in corruption probe

By <u>Associated Press</u>
18 MARCH 2017 • 12:51AM
Two big Brazilian meatpackers bribed inspectors to keep rotten meat on the market, police charged on Friday in issuing dozens of arrest warrants, while a judge accused the Agriculture Ministry of betraying the country.

**Part of the money allegedly paid by meatpackers JBS and BRF was channeled to two major political parties, including the one of President Michel Temer, police said after a two-year investigation.**

Authorities warned that the case was a severe blow to the international image of Brazil's agribusiness sector, which officials have been counting on heavily for helping Brazil recover from its worst recession in decades.

Investigator Mauricio Moscardi Grillo said at a news conference that the two meatpackers used chemicals to improve the appearance and smell of expired meats. He said at least one executive reported that rotten meat was mixed with healthy meat to be sold to consumers.

Cheaper products like water and manioc flour were also blended with meat sold by the two companies, Grillo said, adding that three plants have been shut down.

The investigator said school children in the southern state of Parana were fed with dangerous meat. "They are getting food made of outdated, rotten and many times cancerous products so the economic interest of this mighty crime gang is obeyed," Grillo said.

**Police said the meatpackers had direct influence in the Agriculture Ministry so they could pick the inspectors who would visit their**

**plants. Those inspectors would produce sanitary certificates regardless of the adulteration of the products, police said.**

In his decision to authorize arrests, Judge Marcos Josegrei da Silva said the Agriculture Ministry has a "staggering" involvement in fraud and corruption. "The ministry was taken hostage by a group of individuals that repeatedly betrayed their obligation of serving society," Silva wrote.

Grillo said some of the expired meat was exported to Europe. He said four containers of BRF meat contaminated with salmonella were stopped in Italy in 2016, but nothing was done against the company.

* * *

Novacki said there were "very small risks" in consuming meat processed by JBS and BRF. "It is not the majority of the meat. But there is (a risk)," he said. "The three or four plants where this happened were shut down today for us to see what happened in each of them." Shares in JBS closed on Friday on the Sao Paulo stock exchange down more than 11 percent, while those of BRF fell almost 8 percent.

Grillo said some of the bribes paid to inspectors were channeled to two political parties – Temer's centrist Brazilian Democratic Movement Party and the right leaning Progressive Party, which is part of the president's governing coalition.

(Emphasis added).

39.    On May 12, 2017, new outlets reported that Brazilian federal police are investigating whether JBS received favorable treatment from state-owned development bank BNDES. The Brazilian federal audit court found irregularities related to a 2007 BNDES loan of 1.13 billion reais ($362 million) to JBS to finance the acquisition of Swift & Co. Investigators suspect fraud in those transactions.

40.    On this news, shares of JBS fell $0.28 per share or over 8% from its previous closing price to close at $6.96 per share on May 12, 2017, further damaging investors.

41.    On May 17, 2017, news outlets reported during aftermarket hours that JBS Chairman Joesley Batista was recorded telling the President of Brazil that J. Batista was providing monthly payments to Eduardo Cunha, former speaker of the lower house of representatives and

lobbyist Lucio Funaro so that they would remain silent while in jail. J. Batista and his brother W. Batista presented the recording to prosecutors as part of plea bargain negotiations. JBS also hired a law firm to discuss a leniency deal with the U.S. Department of Justice.

42.     On this news, share of JBS fell $1.04 per share or over 16% from its previous closing price to close at $5.08 per share on May 18, 2017, further damaging investors.

43.     On May 19, 2017, news outlets reported during aftermarket hours that Brazil's securities regulator said it launched four new probes against meatpacker JBS SA and other companies controlled by Defendants W. Batista and J. Batista to investigate suspicious trades made before markets were rattled by the revelation of a plea deal by the company's top executives.

44.     On this news, shares of JBS fell $1.68 per share or over 31% from its previous closing price to close at $3.68 per share on May 22, 2017, further damaging investors.

45.     As a results of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADRs, Plaintiff and other Class members have suffered significant losses and damages.

### SCIENTER ALLEGATIONS

46.     As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding JBS, their control over, and/or receipt and/or modification of JBS's allegedly materially misleading statements and/or their associations with the Company

which made them privy to confidential proprietary information concerning JBS, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION AND ECONOMIC LOSS

47.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's ADRs price, and operated as a fraud or deceit on acquirers of the Company's ADRs. As detailed above, when the truth about JBS's misconduct and its lack of operational and financial controls was revealed, the value of the Company's ADRs declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in JBS's share price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the ADRs price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's share, price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

48.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of JBS's business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not

false or misleading, causing JBS's ADRs to be artificially inflated. Plaintiff and other Class members purchased JBS's ADRs at those artificially inflated prices, causing them to suffer the damages complained of herein.

### PRESUMPTION OF RELIANCE; FRAUD-ON-THE-MARKET

49.    At all relevant times, the market for JBS ADRs was an efficient market for the following reasons, among others:

(a) JBS ADRs met the requirements for listing, and were listed and actively traded on the OTC Market, a highly efficient market;

(b) During the Class Period, JBS ADRs were actively traded, demonstrating a strong presumption of an efficient market;

(c) As a regulated issuer, JBS filed with the SEC periodic public reports during the Class Period;

(d) JBS regularly communicated with public investors via established market communication mechanisms;

(e) JBS was followed by analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f) Unexpected material news about JBS was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

50.    As a result of the foregoing, the market for JBS ADRs promptly digested current information regarding JBS from all publicly available sources and reflected such information in JBS's stock price. Under these circumstances, all purchasers of JBS ADRs during the Class Period

suffered similar injury through their purchase of JBS's ADRs at artificially inflated prices, and a presumption of reliance applies.

51.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. Here, the facts withheld are material because an investor would have considered the Company's financials and adequacy of internal controls over financial reporting when deciding whether to purchase and/or sell stock in JBS.

## NO SAFE HARBOR; INAPPLICABILITY OF BESPEAKS CAUTION DOCTRINE

52.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

53.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

54.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of JBS who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by the defendants were assumptions underlying or relating to any plan, projection, or statement of future

economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action on behalf of all individuals and entities who purchased or otherwise acquired JBS ADRs on the public market during the Class Period, and were damaged, excluding the Company, the defendants and each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the defendants have or had a controlling interest (the "Class").

56.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, JBS ADRs were actively traded on the OTC Market. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by JBS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

57.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the defendants' respective wrongful conduct in violation of the federal laws complained of herein.

58.     Plaintiff has and will continue to fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities

litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

59.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by the defendants' respective acts as alleged herein;

(b)    whether the defendants acted knowingly or with deliberate recklessness in issuing false and misleading financial statements;

(c)    whether the price of JBS ADRs during the Class Period was artificially inflated because of the defendants' conduct complained of herein; and

(d)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

60.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I
### *Violation of Section 10(b) and Rule 10b-5 Against All Defendants*

61.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

62.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and

other members of the Class to purchase JBS ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

63. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to maintain artificially high market prices for JBS ADRs in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

64. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of JBS as specified herein.

65. These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of JBS's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about JBS and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of JBS ADRs during the Class Period.

66.    Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each Individual Defendant, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendant and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each Individual Defendant was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

67.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing JBS's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its ADRs. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of JBS's ADRs was artificially inflated during the Class Period. In ignorance of the fact that market prices of JBS's publicly-traded ADRs were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the ADRs trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired JBS' ADRs during the Class Period at artificially high prices and were or will be damaged thereby.

69.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding JBS's financial results, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their JBS ADRs, or, if they had acquired such ADRs during the Class Period, they would not have done so at the artificially inflated prices that they paid.

70.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's ADRs during the Class Period.

72.     This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of ADRs giving rise to the cause of action.

## COUNT II
### *The Individual Defendants Violated Section 20(a) of the Exchange Act*

73.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.    The Individual Defendants acted as controlling persons of JBS within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

75.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

76.    As set forth above, JBS, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

77.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of

Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

78.     This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of ADRs giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a)     Determining that this action is a proper class action, certifying Plaintiff as class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law; and

(e)     Such other and further relief as the Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a jury trial.

Dated: July 6, 2017

/s/ Adam M. Apton
**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
30 Broad Street, 24th Floor
New York, NY 10004
Tel: (212) 363-7500
Fax: (212) 363-7171
Email: nporritt@zlk.com
Email: aapton@zlk.com

*Attorneys for Plaintiff GWI Enterprise Ltd.*